IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MELANIE KELSAY,<br><br>                    Plaintiff,<br><br>vs.<br><br>MATT ERNST, INDIVIDUALLY<br>AND IN HIS OFFICIAL CAPACITY,<br>et al.,<br><br>                    Defendants. | 4:15-CV-3077<br><br><br>MEMORANDUM AND ORDER |

This matter is before the Court on two motions for summary judgment. First, defendants Matt Ernst and Jay Welch move for summary judgment (filing 52) with respect to the plaintiff's excessive force claim. The Court will grant that motion in part and deny it in part. Specifically, the Court will grant summary judgment with respect to the plaintiff's claim against Ernst and Welch in their official capacities, and with respect to her claim against Welch in his individual capacity. But the Court will deny the motion with respect to the plaintiff's individual-capacity claim against Ernst.

Second, defendants Russell Kirkpatrick, Mathew Bornemeier, and the City of Wymore move for summary judgment (filing 54) with respect to the plaintiff's claims against them. The Court will grant that motion.

## I. BACKGROUND

The underlying incident occurred at the city pool in Wymore, Nebraska on May 29, 2014. Filing 53-8 at 10. The plaintiff, Melanie Kelsay, was at the pool with her children and Patrick Caslin, who Kelsay describes as a "family friend." Filing 53-8 at 11. At some point, someone called police and said that

Kelsay and Caslin were involved in what was reported as a "domestic assault." Filing 53-8 at 19. According to Kelsay, it was just horseplay: Kelsay says she was taking pictures of the children by the side of the pool and Caslin came up behind her and pretended he was going to throw her in the pool, and she told him not to. Filing 53-8 at 19.[1] But regardless, when Kelsay and the others left the pool, Wymore police chief Kirkpatrick and Wymore police officer Bornemeier were waiting for them. Filing 53-8 at 20.

According to Kelsay, Kirkpatrick and Bornemeier confronted Kelsay and her companions as soon as they left the pool. Filing 53-8 at 29. Kirkpatrick told Caslin that Caslin needed to come to the police car with him. Filing 53-8 at 29. After repeatedly being asked why, Kirkpatrick said that someone had reported a domestic assault. Filing 53-8 at 29. So, Kelsay says, she told Kirkpatrick that nothing had happened and that she and Caslin had just been playing around. Filing 53-8 at 29.

Caslin agreed to accompany Kirkpatrick, and Kelsay could no longer hear them, but she saw that Caslin was being handcuffed. Filing 53-8 at 30. Kelsay says she "was mad" but didn't approach the patrol car at that point. Filing 53-8 at 30-31. After Kirkpatrick went to speak to some other witnesses, though, Kelsay went to the window of the patrol car and asked Caslin, who was in the back, what to do. Filing 53-8 at 31. Bornemeier warned Kelsay to back up, and Kelsay says she backed up about 15 feet. Filing 53-8 at 31. By time, deputies from the Gage County sheriff's office—Ernst and Welch—had arrived on the scene. Filing 53-8 at 32.

---

[1] The parties dispute what actually happened between Kelsay and Caslin that prompted the call to police. *Compare* filing 53 at 4 *with* filing 57 at 4-5. But it is not clear to the Court why the precise nature of that incident is relevant to the plaintiff's remaining claims.

Kelsay tried to call her husband, and then some other people after she was unable to reach her husband. Filing 53-8 at 32. Kelsay says that Kirkpatrick yelled over to her and asked if she was calling her husband, and that when she said "yes," he said "good." Filing 53-8 at 32. Kelsay walked toward her children. Filing 53-8 at 35. One of Kelsay's daughters was arguing with someone. Filing 53-8 at 38. Ernst approached Kelsay quickly from behind. Filing 53-8 at 36-37.

Kelsay says that Ernst grabbed her arm and "said to get back here." Filing 53-8 at 43. So, Kelsay says, she turned around and told him that someone was "talking shit to my kid" and she wanted to know what was happening. Filing 53-8 at 43. She denies resisting Ernst's efforts to handcuff or arrest her. Filing 53-8 at 139. But she continued to walk toward her daughter. Filing 53-8 at 43. Then, according to Kelsay, Ernst "ran up behind [her] and he grabbed [her] and slammed [her] to the ground." Filing 53-8 at 51. Kelsay is 5 feet tall and weighs about 130 pounds. Filing 53-8 at 97. She says that Ernst had her in "like, a bear hug" and lifted her completely off the ground. Filing 53-8 at 98-99, 139. She remembers being "up in the air" and "hitting the ground," and then doesn't remember anything until being picked up, already in handcuffs. Filing 53-8 at 52, 140. She briefly lost consciousness. Filing 53-8 at 25, 140.

Ernst's account of the incident differs in some respects. Ernst says that he saw Kelsay "hurriedly begin walking" toward the person arguing with her daughter, and was "screaming at this person." Filing 17-1 at 2. So, Ernst says, he ran to Kelsay and placed himself between her and the woman she was approaching, and instructed her to stop moving and put her hands behind her back. Filing 17-1 at 2. Ernst reports that Kelsay "then became violent," attempting to hit and kick him, so that's when he took her forcibly to

the ground. Filing 17-1 at 2. Welch's account is consistent with Ernst's. Filing 17-3 at 2. And other witnesses have corroborated different aspects of that account. Filing 53-8 at 166, 169; filing 53-9 at 6-8, 12.

After she came to, Kelsay complained of a broken shoulder. Filing 53-8 at 56, 140. Ernst placed her in a patrol car and took her to the Gage County jail, where correctional officers said that she would need to be examined by a doctor. Filing 17-1 at 2; filing 53-8 at 57, 62. Kirkpatrick took her to the hospital, where she was found to have a broken collarbone. Filing 53-8 at 68, 76. Kelsay claims to have incurred significant medical bills and permanent injury. Filing 21-1 at 4. She was eventually convicted of attempting to obstruct government operations and disturbing the peace. Filing 17-5 at 6, 9.

Kelsay sued the City of Wymore and Kirkpatrick, Bornemeier, Ernst, and Welch (in their individual and official capacities) alleging claims for wrongful arrest, excessive force, and deliberate indifference to medical needs. Filing 13. The Court has previously dismissed the wrongful arrest and deliberate indifference claims as to Ernst and Welch: the Court found that the wrongful arrest claim was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), filing 28, and that there was no evidence Ernst or Welch had been deliberately indifferent to Kelsay's medical needs, filing 61. So, the only claim remaining as to Ernst and Welch is the excessive force claim. All three of Kelsay's claims remain pending as to Wymore, Kirkpatrick, and Bornemeier.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes

- 4 -

demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## III. DISCUSSION

Ernst and Welch move to dismiss Kelsay's remaining claim against them, for excessive force. Kirkpatrick, Bornemeier, and the City of Wymore move to dismiss all of Kelsay's claims as to them.

### 1. ERNST AND WELCH

Kelsay sued Ernst and Welch in their individual and official capacities. Those claims will be considered separately.

(a) Individual-Capacity Claims

Ernst and Welch argue that they are entitled to qualified immunity from Kelsay's individual-capacity claims. Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Ransom v. Grisafe*, 790 F.3d 804, 810-11 (8th Cir. 2015), *cert. denied,* 136 S. Ct. 838 (2016). This immunity applies to discretionary functions of government actors, including the decision to use force and to detain an individual. *Id.* To overcome the defense of qualified immunity, a plaintiff must show that the officer's actions violated a constitutional right that was clearly established at the time of their alleged misconduct. *Id.* In other words, the officer must have been plainly incompetent, or must have knowingly violated the law, when he used force to seize the plaintiff. *Id.*

So, for purposes of qualified immunity, the Court considers (1) whether law enforcement violated a constitutional right—here, whether their use of force was objectively reasonable—and, (2) whether that right was clearly established at the time of the incident. Once the relevant predicate facts are established, the reasonableness of the officer's conduct under the circumstances is a question of law. *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011); *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007); *see Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). And the ultimate question of qualified immunity is also one of law, once the predicate facts are determined. *Littrell v. Franklin*, 388 F.3d 578, 584-85 (8th Cir. 2004).

*(i) Violation of Constitutional Right*

A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard.

- 6 -

*Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Determining the objective reasonableness of a particular seizure under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* This inquiry requires analyzing the totality of the circumstances, "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation and quotation omitted). This allows for the fact that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (citation and quotation omitted).

Police officers undoubtedly have a right to use some degree of physical force, or threat thereof, to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency. *Grider v. Bowling*, 785 F.3d 1248, 1252 (8th Cir. 2015). Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The key question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772 (8th Cir. 2014); *see Schoettle v. Jefferson Cty.*, 788 F.3d 855, 859 (8th Cir. 2015). The Court looks to the specific circumstances, such as the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she is actively resisting arrest or attempting to evade arrest by flight. *Peterson*, 754 F.3d at 600.

The Court begins with Ernst, who actually employed the force about which Kelsay complains. Ernst argues that he is entitled to qualified immunity because the technique he used "was a reasonable maneuver under the circumstances to control Plaintiff Kelsay, who was perceived by all officers and objective witnesses present to be aggressive, resisting, and noncompliant." Filing 53 at 13-14. Ernst also contends that the use of force was justified by Kelsay's "seeming effort to verbally berate and to even potentially fight certain witnesses" and that

> Kelsay actively resisted Deputy Ernst's efforts to place her in handcuffs to effectuate her arrest. When Kelsay started to refuse to submit to arrest, and started to kick and physically resist Deputy Ernst, she was not yet handcuffed, and he used a common law enforcement maneuver to "bear hug" her from behind and take her to the ground to subdue her in order to get her handcuffed. . . . All witnesses agree that Kelsay began her interfering behaviors as Caslin was arrested, and subsequently directed her anger towards certain witnesses, all of which collectively led to her arrest[.]

Filing 53 at 20. But those arguments are inconsistent with the Court's standard of review on summary judgment, under which the question is "whether the facts, *viewed in the light most favorable to the plaintiff*, demonstrate the deprivation of a constitutional or statutory right." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017) (emphasis supplied). The Court must accept Kelsay's account of the facts where there are material inconsistencies. *Henderson v. Munn*, 439 F.3d 497, 499 n.2 (8th Cir. 2006). And Kelsay denies the conduct relied upon by Ernst to justify his use of force.

Ernst's argument essentially asks the Court to find that Kelsay's testimony is incredible. But at the summary judgment stage, the Court is not permitted to weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *United States v. Bame*, 721 F.3d 1025, 1028 (8th Cir. 2013); *see Coker v. Arkansas State Police*, 734 F.3d 838, 843 (8th Cir. 2013). The Court must view the evidence in the light most favorable to Kelsay, and seen in that light—if her testimony was credited—a finder of fact could conclude that Ernst's use of force was unreasonable. If Kelsay's testimony is credited, even in part, it establishes that she was walking away from police, and was not in a position to threaten witnesses or law enforcement. While she was not precisely "compliant"—that is, she had been told to stop but kept walking instead—she was not using force or actively resisting arrest, and posed no danger to anyone.[2] *See, Kukla v. Hulm*, 310 F.3d 1046, 1050 (8th Cir. 2002); *Lollie v. Johnson*, 159 F. Supp. 3d 945, 959-60 (D. Minn. 2016).

Ernst relies on the opinion of Mark Sundermeier, an experienced law enforcement officer whom the defendants proffer as an expert on police use of force. Filing 53-2. He opines that Ernst's use of force was reasonable and

---

[2] The Court has carefully considered its previous conclusion that Kelsay's excessive force claim is not *Heck*-barred. Filing 28 at 4-5. But the Court stands by its previous conclusion that the Eighth Circuit's decision in *Colbert v. City of Monticello, Ark.* is on point. 775 F.3d 1006, 1007-08 (8th Cir. 2014). Specifically, Kelsay's conviction for attempting to obstruct government operations did not require her to use force or violence. Neb. Rev. Stat. § 28-901; *State v. Stolen*, 755 N.W.2d 596, 601-02 (Neb. 2008). Nor did her conviction for disturbing the peace, despite the allegation that she had engaged in a "verbal and physical altercation with law enforcement personnel." Filing 17-5 at 9; *see*, Neb. Rev. Stat. § 28-1322; *State v. Broadstone*, 447 N.W.2d 30, 33-34 (Neb. 1989); *see also Union Pac. R. Co. v. State*, 130 N.W. 277, 278 (Neb. 1911).

prudent. Filing 53-2 at 1. But that opinion rests on factual assumptions that are inconsistent with Kelsay's account of the incident: he presumes that Kelsay was approaching other witnesses and yelling at them aggressively, that she was non-compliant with Ernst's efforts to control her, and that she lifted her own feet off the ground and was kicking and flailing. Filing 53-2 at 2. But Kelsay says otherwise. Sundermeier notes that, but contends that Kelsay's account is "directly contradicted" by the officers and "objective third-party witnesses," and that all the "objective witnesses" describe the incident the same way. Filing 53-2 at 4. And perhaps that's how it happened, but as explained above, it is not the Court's function, on summary judgment, to decide which witnesses are more credible. Sundermeier's assessment does not preclude the existence of genuine issues of material fact as to what actually happened in the parking lot of the Wymore pool.

### (ii) Clearly Established Right

Moreover, taking Kelsay's version of events as true, the Court finds that her right to be free from the excessive use of force under those circumstances was clearly established. For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Parker v. Chard,* 777 F.3d 977, 980 (8th Cir. 2015). It is unnecessary to have a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. *Id.* at 980. Clearly established law is not defined at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. *Id.* (citing *Plumhoff,* 134 S. Ct. at 2023). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (quotation omitted). "Such

specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (quotation omitted).

The Court evaluates the defense of qualified immunity from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation. *Id.* Thus, if an officer acts in a manner about which officers of reasonable competence could disagree, the officer should be immune from liability. *Johnson v. Schneiderheinz*, 102 F.3d 340, 341 (8th Cir. 1996).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. . . . An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001), *overruled on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009). Qualified immunity operates to protect officers from the sometimes hazy border between excessive and acceptable force, and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. *Id.* at 206.

It is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. *Brown v. City of Golden*

*Valley*, 574 F.3d 491, 499 (8th Cir. 2009). And it has often been held under comparable circumstances that the use of force may be unwarranted against a person who poses no threat and is not actively resisting arrest or attempting to flee, even if that person is interfering with police or behaving disrespectfully. *See, e.g.*, *Shekleton v. Eichenberger*, 677 F.3d 361, 366-67 (8th Cir. 2012); *Montoya v. City of Flandreau*, 669 F.3d 867, 871-72 (8th Cir. 2012); *Johnson v. Carroll*, 658 F.3d 819, 827 (8th Cir. 2011); *Shannon v. Koehler*, 616 F.3d 855, 864-65 (8th Cir. 2010); *Brown*, 574 F.3d at 499; *Kukla*, 310 F.3d at 1050; *Lollie*, 159 F. Supp. 3d at 959-60. Force may only be used to overcome physical resistance or threatened force, and may not be employed simply because a suspect is disagreeable. *See Shannon*, 616 F.3d at 864-65. In this case, if Kelsay's account is taken as true, then the excessiveness of Ernst's use of force would have been apparent. Accordingly, there are genuine issues of material fact with respect to Ernst that preclude qualified immunity and summary judgment.

### (iii) Claim Against Welch

That having been said, the same is not true of Welch, because he did not employ force against Kelsay. Kelsay's claim against Welch depends on his failure to intervene to prevent Ernst's use of force.

An officer who fails to intervene to prevent the unconstitutional use of excessive force by another officer may be held liable for violating the Fourth Amendment. *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015). To establish a failure to intervene claim, however, the plaintiff must show that the officer observed or had reason to know that excessive force would be or was being used. *Id.* And that showing was not made here. Kelsay says her interaction with Ernst resulting in his use of force was "very quick": that it took "[m]aybe 30 seconds to a minute. It was - it was brief." Filing 53-8

at 85. There is nothing in the record to suggest that Welch had any notice Ernst intended to use force, much less any opportunity to intervene.

Kelsay seems to argue that Welch can be held liable because he may have indicated to Ernst that she was to be taken into custody—therefore, Kelsay argues, Welch "was complicit in causing her to be tackled." Filing 57 at 30. But an officer may be held liable only for his or her own use of excessive force, so because Welch was not involved in the allegedly unconstitutional acts of Ernst, Welch could not have violated Kelsay's constitutional rights based on Ernst's use of excessive force. Grider, 785 F.3d at 1252. And while an officer "can be liable for nonfeasance, where the officer is aware of the abuse and the duration of the episode is sufficient to permit an inference of tacit collaboration[,]" there is no evidence here that Welch was aware of Ernst's takedown before it occurred or had the opportunity to "take action to deescalate the situation." *Id.* at 1253. As a matter of law, Welch cannot be liable for nonfeasance under the circumstances of this case. *See id.* Accordingly, Kelsay's excessive force claim against Welch, in his individual capacity, will be dismissed.

(b) Official-Capacity Claims

Kelsay also brought her excessive force claim against Ernst and Welch in their official capacities. A suit against government officials in their official capacity is another way of pleading an action against the entity of which they were agents. Baker v. Chisom, 501 F.3d 920, 923 (8th Cir. 2007). So, the actual defendant with respect to official-capacity claims against Ernst and Welch is Gage County. *See id.* at 925.

A local government can be held liable under § 1983 only where the local government *itself* causes the constitutional violation at issue. City of Canton v. Harris, 489 U.S. 378, 385 (1989). *Respondeat superior* or vicarious liability

will not attach under § 1983. *City of Canton*, 489 U.S. at 385; *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). But local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Johnson*, 725 F.3d at 828 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Moreover, local governments may be sued for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels. *Id.* (citing *Monell*, 436 U.S. at 690-91). And § 1983 liability may attach if a constitutional violation resulted from a "deliberately indifferent" failure to train or supervise. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *City of Canton*, 489 U.S. at 388.)

Gage County's Use of Force policy provides that:

> No specific rule fits all cases as to how much force and means may be used in an arrest and each case must be determined in the light of its own facts and circumstances. The person making an arrest is acting lawfully if the force and means used are such as would be considered necessary by the ordinary reasonable person placed in the same position and if from the standpoint of such a reasonable person, the force and means used was apparently necessary, the person making the arrest if [sic] justified even though in the light of the actual facts later discovered such a degree of force or means was not actually necessary.

> Willful inhumanity or oppression toward a prisoner or unlawfully assaulting or beating a prisoner is punishable as a crime but if the assault is aggravated by its violence, it may amount to a felony and if death ensues, it might amount to murder.
>
> Deputies shall not use unnecessary force or violence in making an arrest or in dealing with a prisoner or any person.

Filing 53-12 at 1. Kelsay's argument with respect to that policy is brief:

> The policies of Gage county offer little in the way of guidance to the officers. The policies basically say "don't use too much force." The expert witness [Sundermeier] proffered by the Defendant's [sic] in this case claims the policy and it "was within the standard use of force continuum expected to be used by officers acting within the scope of their lawful duties." The policy does not contain a use of force continuum which is expected.

Filing 57 at 32.

But that argument does not direct the Court to any facially unlawful county policy or custom. See *Atkinson*, 709 F.3d at 1216. Nor does it direct the Court to evidence that Kelsay's injuries were caused by any county "action or inaction, taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* And even the *complete* absence of a written policy on the use of force would not demonstrate "deliberate indifference." *See id.* A local government "may not be held liable under § 1983 merely because it failed to implement a policy that would have prevented an unconstitutional act by an

employee otherwise left to his own discretion." *Atkinson,* 709 F.3d at 1216; *see Szabla v. City of Brooklyn Park, Minnesota,* 486 F.3d 385, 390 (8th Cir. 2007).

> [A] written policy that is facially constitutional, but fails to give detailed guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability. There is still potential for municipal liability based on a policy in that situation, but only where a city's inaction reflects a deliberate indifference to the constitutional rights of the citizenry, such that inadequate training or supervision actually represents the city's "policy."

*Szabla,* 486 F.3d at 392. And there is neither evidence nor argument here to support a finding that Gage County's failure to adopt a use-of-force policy including a "use of force continuum" was a "deliberate or conscious choice by policymakers" that "was the product of deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 390. Accordingly Ernst and Welch are entitled to summary judgment with respect to Kelsay's official-capacity excessive force claims. *See id.*

## 2. CITY OF WYMORE DEFENDANTS

As above, Kirkpatrick and Bornemeier have been sued in both their individual and official capacities. And the City of Wymore has also been sued. The Court will again consider Kelsay's individual-capacity and official-capacity claims separately.

(a) Individual-Capacity Claims

As noted above, Kelsay has three remaining claims against the Wymore defendants: unlawful arrest, excessive force, and deliberate indifference to serious medical needs. None of those claims are cognizable against Kirkpatrick or Bornemeier.

To begin with, the Court previously dismissed Kelsay's unlawful arrest claim, as against Ernst and Welch, pursuant to *Heck*, 512 U.S. 477. Filing 28 at 3-4. That conclusion has equal force with respect to Kirkpatrick and Bornemeier, and Kelsay's unlawful arrest claim will be dismissed as to them as well.

Next, the Court's reasoning above with respect to Welch is also dispositive of Kelsay's excessive force claim as to Kirkpatrick and Bornemeier. There is evidence that Kirkpatrick helped handcuff Kelsay after she was forcibly taken into custody. Filing 17-3 at 2; filing 53-8 at 206. But there is no evidence that Kirkpatrick and Bornemeier used excessive force, had any reason to know Ernst intended to use force, or were in any position to intervene.

Finally, the Court previously dismissed Kelsay's claim for deliberate indifference to a serious medical need as asserted against Ernst and Welch, finding no evidence of any detrimental effect from any delay in providing medical treatment. Filing 61 at 2-5. The same reasoning is even more applicable to Kirkpatrick and Bornemeier, who also bore no responsibility for any delay in providing medical care.

(b) Official-Capacity Claims

Kelsay also asserts her claims against the City of Wymore, and as explained above, her claims against Kirkpatrick and Bornemeier in their

official capacities are effectively claims against the City as well. *See Baker*, 501 F.3d at 925.

The Court will dismiss Kelsay's claims against the City for two reasons. First, the Court has already rejected Kelsay's claims of a constitutional violation on the part of Kirkpatrick or Bornemeier, and without a constitutional violation there can be no § 1983 municipal liability, *Hall v. Ramsey Cty.*, 801 F.3d 912, 920 n.5 (8th Cir. 2015), *cert. denied sub nom. Hall v. Ramsey Cty., Minn.*, 136 S. Ct. 2379 (2016). Second, there is no evidence that a policy or custom of the City of Wymore caused a constitutional violation. *See Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006).

Kelsay's argument to the contrary—which appears to be limited to her claim for deliberate indifference to serious medical needs—is premised on two contentions. First, she claims that Kirkpatrick's decisions were official city "policy" because he, as the Wymore chief of police, was a "policymaker" for the City of Wymore. But the Eighth Circuit rejected a similar argument in *Atkinson*, in which the plaintiff argued that the police chief for a Missouri city was a "final policymaker" for the city. 709 F.3d at 1214. The Court of Appeals explained that identification of a final policymaking authority for a local government is a question of state law, and that under Missouri law, the mayor and the board of aldermen for the city were the final policymakers. *Id.* at 1215. Specifically, the Court of Appeals relied on a Missouri statute providing that the mayor and board of aldermen were responsible for the "good government of the city [and] the preservation of peace and good order." *Id.* (quoting Mo. Ann. Stat. § 79.110); *see Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010).

Similar statutory language is found here: under Nebraska law, it is the mayor of a city of the second class like Wymore who "shall have

- 18 -

4:15-cv-03077-JMG-CRZ   Doc # 63   Filed: 05/19/17   Page 19 of 22 - Page ID # 890

superintendence and control of all the officers and affairs of the city and shall take care that the ordinances of the city and all laws governing cities of the second class are complied with." Neb. Rev. Stat. § 17-110. The city is empowered to establish a police department, and define its powers and duties, which include the power to arrest people who break the law. Neb. Rev. Stat. §§ 17-118 & 17-124. The mayor, with the consent of the city council, appoints police officers, and the city council adopts rules and regulations governing the removal, demotion, or suspension of police officers, including the chief of police. Neb. Rev. Stat. § 17-107(3).

In other words, under Nebraska state law, it is the elected officials of a city such as Wymore who are the final policymakers for the "superintendence and control of all the officers and affairs of the city." § 17-110; *see Copeland, 613 F.3d at 882*. Kelsay directs the Court to neither "state and local positive law" nor "state and local 'custom or usage' having the force of law" establishing that Kirkpatrick was a "final policymaker." *See Atkinson, 709 F.3d at 1215*. Even if Kirkpatrick was invested with discretion in exercising particular functions—and there is scant evidence of even that much—such discretion "does not, without more, give rise to municipal liability based on an exercise of that discretion." *Copeland, 613 F.3d at 882*. In short, any decision Kirkpatrick may have made regarding medical care for arrestees "is not, as a matter of law, one over which he has any policymaking authority." *See id.* at 883. And the record is devoid of any evidence showing that the elected officials of Wymore delegated such authority to him. *See id.*

Second, even if Kirkpatrick could be considered a policymaker, there is no evidence of any policy set by Kirkpatrick that is causally connected to any deprivation of Kelsay's rights. Kelsay relies on an affidavit from Gary Redden, who was the safety training officer for Wymore Emergency Medical

- 19 -

Services (EMS). Filing 60 at 29. Redden avers that he stopped by Kirkpatrick's home a few days before Kelsay's arrest "to discuss protocol for the working relationship between the police and the Emergency Management Responders because he was new to Wymore police department and because Officer Bornemeier was also a new officer in need of training." Filing 21-7 at 1. Redden avers that there were "some incidents that were not handled properly" and that

> [w]hile I was visiting with him we discussed protocol of working with the EMS and he actually disagreed with me about whether if a person complained of injury or a suspected medical issue while in custody that he needed to allow them to get medical treatment. He argued with me about what roll [sic] EMS would play on the scene and said "I can do whatever I want to as an officer."

Filing 21-7 at 1. Redden explains that on another occasion, he had experienced Kirkpatrick "interacting with EMS that he acted in an unprofessional manner and was in the way of us treating a patient. Also borderline practice medicine without a license." Filing 21-7 at 2. Redden opines that "[t]he protocol in Nebraska when a person is complaining of injury or need of medical treatment, Law enforcement in Nebraska is supposed to call EMS to have the patient examined." Filing 21-7 at 2. "There were[,]" Redden says, "EMS people on duty when Kelsay was injured and they would have checked her out." Filing 21-7 at 2.

But the issue in this case is not the proper use of Wymore EMS, so Redden's opinion that Kirkpatrick had not appropriately deferred to Wymore EMS is beside the point. The issue is whether law enforcement was

deliberately indifferent to a serious medical need in violation of the Fourteenth Amendment. *See Ryan v. Armstrong*, 850 F.3d 419, 424-25 (8th Cir. 2017). And the Court is not aware of any authority establishing a *constitutional* requirement that emergency medical services be summoned to the scene of an injury, and deferred to on the scene, so long as what *is* done satisfies constitutional standards. The Court has already determined that it did. *See* filing 61 at 2-5. Moreover, it was Ernst who injured Kelsay, Ernst who took her into custody, and Ernst who transported her to the Gage County jail—and Kirkpatrick who eventually took her from the jail to the hospital. So, there is little to causally connect any purported "policy" of Kirkpatrick's to any delay in Kelsay's treatment.

In sum, the Court finds no evidence that Kirkpatrick or Bornemeier violated Kelsay's constitutional rights, and no evidence linking the violations she alleges to any municipal policy or custom. Kelsay's claims against Kirkpatrick and Bornemeier in their individual and official capacities, and against the City of Wymore, will be dismissed.

## IV. CONCLUSION

Qualified immunity is denied with respect to Kelsay's excessive force claim against Ernst in his individual capacity, and that claim may proceed. Kelsay's remaining claims are dismissed.

IT IS ORDERED:

1.  Ernst and Welch's motion for summary judgment with respect to Kelsay's excessive force claim (filing 52) is granted in part and in part denied.

2.      Kelsay's excessive force claim against Welch in his individual capacity, and against Ernst and Welch in their official capacities, is dismissed.

3.      The Wymore defendants' motion for summary judgment (filing 54) is granted.

4.      Kelsay's claims against Kirkpatrick and Bornemeier in their individual and official capacities, and against the City of Wymore, are dismissed.

5.      Welch, Kirkpatrick, Bornemeier, and the City of Wymore are terminated as parties.

Dated this 19th day of May, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge

- 22 -